**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Wallace A. SHACKELFORD,**
**Defendant-Appellant.**

**No. 73-1053.**

United States Court of Appeals,
Ninth Circuit.

Feb. 20, 1974.

Certiorari Denied June 3, 1974.
See 94 S.Ct. 2647.

Ely, Circuit Judge, dissented and filed opinion.

Before MERRILL and ELY, Circuit Judges, and MURPHY,* District Judge.

OPINION

MURPHY, District Judge.

Defendant appeals his conviction after a jury trial in the District of Arizona for a violation of the Hobbs Act, 18 U. S.C. § 1951, in that he attempted to obstruct and delay Trans World Airlines' flights in interstate commerce by an attempted $270,000 extortion.

The principal issue on appeal raises the recurring question of the *quantum* of proof the prosecution must offer to overcome an insanity defense. At trial the defense of insanity was grounded on the testimony of a psychiatrist. Defendant did not testify. The Government relied on its extensive cross-examination of defendant's psychiatric expert and offered no expert testimony in rebuttal but only that of lay witnesses.

It is appellant's submission that the law in this Circuit is "that when a defendant introduces psychiatric testimony sufficient to support a finding of insanity and where the Government relies entirely on lay witnesses to prove sanity, the Government has failed to carry its burden of proof as a matter of law." (Appellant's Opening Brief, pp. 30, 31). He relies on United States v. Cooper, 465 F.2d 451 (9th Cir. 1973), and Buatte v. United States, 330 F.2d 342 (9th Cir.) (*Buatte I*), rehearing denied, 331 F.2d 848 (9th Cir. 1964) (per curiam).

We reject this argument and affirm.

Neither *Buatte I* nor *Cooper* supports such a contention. It is true that in *Cooper* Judge Hufstedler, writing for the majority, did state:

"We held in Buatte v. United States * * * that when the defendant introduces expert psychiatric testimony that is sufficient to support a finding of insanity and when the Government relies *entirely* on lay witnesses to

Fredric F. Kay (argued), Asst. Federal Public Defender, Tucson, Ariz., for defendant-appellant.

William C. Smitherman, U. S. Atty., Tucson, Ariz., for plaintiff-appellee.

* Honorable Thomas F. Murphy, Senior United States District Judge, Southern District of New York, sitting by designation.

prove sanity, the Government has failed to carry its burden of proof as a matter of law." United States v. Cooper, *supra*, 465 F.2d at 453. (Emphasis supplied.)

This sentence was immediately qualified and explained by the Judge as follows:

> "To sustain Cooper's conviction, the Government must accomplish two feats: (1) it must find a way to destroy Dr. Polos' testimony to eliminate *Buatte I*, and (2) after razing Dr. Polos' testimony, it must find enough affirmative evidence of Cooper's sanity to prove that he was sane beyond a reasonable doubt. The Government did not succeed on either count." *Id.* at 453.

A fair reading of these consecutive statements makes it clear that the Judge purposely inserted the adverb "entirely" in the first sentence to emphasize that if the psychiatric testimony was not destroyed or razed by cross-examination, rebuttal lay witnesses could not sustain the burden then cast on the Government to prove that defendant was sane beyond a reasonable doubt.

If further evidence is needed, we are confirmed in our analysis by the reaffirmation in Judge Hufstedler's opinion of "the principal stated in *Ingman*: 'a jury may, of course, reject expert opinion if it finds that the opinion was based on an incorrect view of the facts.'" *Cooper, supra*, at 454.

In *Buatte I*, Judge Pope scrupulously reviewed the psychiatric evidence of the defense and added: "What confirms the strength of this testimony is the fact that the defendant had a record of service, both in the Navy and in the Army, showing severe mental impairment." *Buatte I, supra*, 330 F.2d at 344. He then reviewed these independent records, and observed:

> "This account of the testimony relating to defendant's insanity is sufficient to disclose that the evidence on that point was substantial and reasonably impressive. When that evidence was received, there was presented to the Government an obligation to meet the requirement stated in Davis v. United States, 165 U.S. 373, 378, 17 S.Ct. 360, 41 L.Ed. 750, as follows: '[W]hile it was true that every man is presumed to be sane, yet whenever by the testimony the question of insanity is raised then the fact of sanity, as any other essential fact in the case, must be established to the satisfaction of the jury beyond a reasonable doubt'." *Id.* at 344–345 (fn. omitted).

The evidence in the case posed difficulties for the Government, he said, since the defendant's mental breaks into insanity would occur at irregular intervals, that is, they would be interspersed between more or less lucid intervals. The Government then was confronted with the most difficult task of showing "that at the time of the commission of the crime * * * the defendant was in what might be called by laymen a 'lucid interval'. Under these circumstances it would not suffice to produce a witness to testify that a few hours before the commission of the offense the accused was acting in an apparently normal manner. What was required was some evidence that he was legally sane during the short period when the killing occurred." *Id.*, at 345. He then reviewed the testimony of the witnesses which the Government called in rebuttal, including the opinion of a *psychiatrist* who, unfortunately for the Government, expressed his opinion ambivalently, *i. e.*, that the defendant " 'might well have known the difference' between right and wrong on April 7." *Id.* at 346.

The conclusion of the court, based upon its analysis of the evidence, was that

> "[o]n this record we are compelled to hold that the Government failed to produce sufficient evidence to support a finding of sanity by the jury. There is a complete absence of evidence to show defendant was sane at the critical time, namely, the period when defendant was at the tent where the killing occurred." *Id.* at 347.

The above vividly demonstrates that *Buatte* is not authority for the proposition proffered by the appellant.

The rationale of *Buatte I* was further developed when the Government petitioned for rehearing. Buatte v. United States, 331 F.2d 848 (9th Cir. 1964). The Government asked that if the judgment was to be reversed, it be remanded for a new trial rather than with instructions to acquit. "The appellee undertook in its petition to indicate the additional evidence which it might produce upon a new trial and which it asserted would be adequate to support a conviction of the appellant." 331 F.2d at 848. (The opinion does not disclose what this evidence was.) The court denied the petition with this observation: " * * * [the court] is of the view that a new trial would serve no purpose and that neither the types of evidence listed in the appellee's petition nor any other conceivable evidence would suffice to satisfy the requirement set forth in Davis v. United States, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750." *Id.* We get the impression from this that the *Buatte I* panel felt that the critical time, namely, the period when the defendant was at the tent where the killing occurred, was so short and without witnesses that it would not be possible, medically or otherwise, to prove that it was during a lucid interval.

In any event, the phrase came back to plague a different panel when Buatte appealed another conviction, this time for assault with intent to commit murder on the person of the brother of the young girl killed in *Buatte I*. In Buatte v. United States, 350 F.2d 389 (9th Cir. 1965), this Court was confronted with the argument that the above quoted statement was binding on the trial court. It held, however, "We do not consider this statement as a decisional ruling that, in another criminal case arising out of the same general incident, but involving another victim, the Government would necessarily be incapable of sustaining its burden of proof on the insanity issue." 350 F.2d at 394 n. 5.

Judge Wright, in his dissent in *Cooper*, correctly interpreted the law in this and other circuits when he stated, "No rule of law requires the government to offer expert medical testimony in every case in which a defendant has a psychiatrist testify for him. The need for expert testimony depends upon the facts of the case." *Cooper, supra,* 465 F.2d at 455. This was, in part, a quotation from our opinion in United States v. Ingman, 426 F.2d 973, 976 (9th Cir. 1970). We also said in *Ingman*: "If a defendant raises the defense of insanity and offers evidence in its support, the presumption that every man is sane disappears. The prosecution then has the burden of proving the fact of sanity beyond a reasonable doubt. * * * But '[t]he nature and quantum of evidence of sanity which the Government must produce to sustain its burden and take the case to the jury will vary in different cases.' " 426 F.2d at 976.

No case that we have been able to find or any that has been called to our attention holds, as a matter of law, that the Government must meet defendant's psychiatric testimony with psychiatric testimony of its own. United States v. Handy, 454 F.2d 885 (9th Cir. 1971), cert. denied, 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86 (1972), as Judge Wright pointed out in *Cooper*, does not hold to the contrary, since the Government, in *Handy*, had presented expert psychiatric evidence. In both McKinney v. United States, 487 F.2d 948 (9th Cir. 1973) and United States v. De Arman, 453 F.2d 409 (9th Cir. 1971), we specifically rejected this same argument. See, Mims v. United States, 375 F.2d 135, 143–144 (5th Cir. 1957) and its progeny; Blake v. United States, 407 F.2d 908 (5th Cir. 1969); United States v. Pitts, 428 F.2d 534 (5th Cir.), cert. denied, 400 U.S. 910, 91 S.Ct. 154, 27 L.Ed. 2d 149 (1970); United States v. Collier, 453 F.2d 1173 (5th Cir. 1972). See also Dusky v. United States, 295 F.2d 743 (8th Cir. 1961) (Blackmun, J.), cert. denied, 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536 (1962).

## THE GOVERNMENT'S PRIMA FACIE CASE

The Government's case in chief, which the defendant does not dispute proved that on April 13, 1972 the defendant telephoned Trans World Airlines, Inc. (TWA) and threatened an employee who took the call that unless he was paid $270,000, TWA would lose a plane. He gave instructions as to the denominations of the money and that the money should be put in a suitcase and delivered to a bar, which he identified by name and address. This plan had been conceived at least a day or two before, since he had offered a barmaid $10,000 to receive the suitcase, and had given her instructions to remove the contents of the suitcase, place it in an empty Budweiser beer case and then give the suitcase to a taxi driver for delivery to some other address. The F.B.I. was notified, a package was prepared to simulate the $270,000, and delivery was made to the bar as demanded. After the barmaid told defendant that there were some suspicious men at the bar, he placed another call to the airline in which he said, "I am calling about the 270. It appears we have a stake-out. You'd better get it off. There is only 24 hours left." As a result of the first call the airline instituted emergency measures: no air freight would leave Tucson for a 24-hour period—all flights were delayed, while all passengers were checked with a device which would indicate the presence of metal in any suitcase.

## DEFENDANT'S PROFESSIONAL EVIDENCE OF INSANITY

Dr. Clymer, who had been practicing psychiatry for four years, testified that he examined defendant twice, first on April 13, 1972[1] for 90 minutes, and on May 15, 1972 for 45 minutes; that he performed a negative neurological exam-

ination of defendant, but had not had any outside tests performed; and that he had seen some unidentified F.B.I. reports.

He was then asked, without further ado:

"Q. Now, based on your examination of Mr. Shackelford and the facts of the case as you knew them can you give an opinion based upon reasonable medical certainty regarding the state of his sanity at the time of the alleged conduct in this case?" (Tr. 130)

There was an objection, and the question was rephrased:

"Q. All right. The question is whether or not the defendant was sane or insane at the time of the alleged conduct as a result of mental disease or defect, in that he lacked substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law?

"A. I believe he was insane at the time and did not fully appreciate the wrongfulness of his act and also was not able to conform his behavior and acts to the law.

"Q. And in that regard do you feel he lacked substantial capacity to do those things?

"A. At the time of the act, yes." (Tr. 131)

The doctor's entire direct examination covers six pages of the typewritten transcript (pp. 125–131).

This short-handed approach[2] to the serious problem of insanity as a defense may well have been "trial strategy" by the Public Defender. Although he had the doctor testify on direct that he examined the defendant at the request of the prosecutor, Mr. Hoffman,[3] he refrained throughout the trial from ac-

---

1. The indictment was filed on April 19, 1972.

2. See 2 Wigmore on Evidence, § 686, at 812 (3d ed. 1940) ; Rule 705, Proposed Rules of Evidence for the United States Courts and Magistrates (not yet approved by Congress), Rule 705, H.R.5463, 93rd Cong., 1st Sess. (1973).

3. This was inaccurate. On cross the doctor correctly testified that he was actually appointed by the court to examine the defendant. We take judicial notice that the practice in the District of Arizona, as in most districts, is for the court to appoint a psychiatrist to examine one charged with a crime. Cf., 18 U.S.C. § 4244.

knowledging the fact that the court had also approved the engagement of a psychiatrist to examine the defendant at defendant's request. In fact, he failed to call such doctor as a witness even though the doctor had twice examined the defendant.[4]

David Hoffman, the Government prosecutor, met the challenge of such abbreviated defense with devastating effect and "razed" the doctor's "expert opinion" parroted from Wade.[5]

The doctor, not having been asked on direct what mental illness defendant had, said on cross-examination that his diagnosis was schizophrenia, latent type, and without defining that illness gave its characteristics:

"A. First of all I could define schizophrenia. Schizophrenia is a mental illness that has three basic characteristics, that in examining a person one would want to look for. The first one is called basically a thinking disorder, difficulty in thinking and placing thoughts in a logical sequence and coming up with a logical conclusion. The second feature is flattening of affect, affect means emotional response; as an example, in the person with schizophrenia they seem very unemotional and seem to lack a certain depth of feeling. Less often, speaking about the third feature in schizophrenia, is the bizarre behavior, mannerisms or gestures that the person might indulge in. More frequently perhaps the first two features, the basic thinking disorder and the flattened affect are customary features. Latent type, as listed by the diagnostic manual, which is sort of the standard diagnostic book, means that the symptoms are not present at the time or are not manifestly present at the time, but that on close examination some of the features can be detected. So in effect schizophrenia would describe a person as having these basic features of schizophrenia latent, meaning not grossly schizophrenic or, in other words, psychotic at the time on examination." (Tr. 133)

He then admitted, however, that when a person was latent in his schizophrenia,[6] he would appear for all intents and purposes to be a normal person and would appreciate wrongfulness and be able to control his conduct. Only when the schizophrenia became active would his ability be impaired. He agreed that when a person becomes an active schizophrenic, as the defendant was, in his opinion, on the 13th of April, that the type is called "paranoid."

4. In the record on appeal the criminal docket entries reveal that on May 9th an order was entered for the transportation of defendant to the office of Marshall W. Jones M.D. On May 11th there was filed an authorization for expert witness (Marshall W. Jones, M. D., psychiatrist). Another entry on June 8th records the filing of an order directing the United States Marshal to transport the defendant to Dr. Marshall W. Jones, M.D., for examination. During a recess at the trial and shortly before summation, the prosecutor offered to the court an additional Instruction on the ground that "The doctor who was appointed by defense counsel was not called as a witness," and after some colloquy the court commented that since there was available a witness who could testify and he was not called, the Government was entitled to the requested Instruction. The court subsequently charged the jury without objection:

"If it is peculiarly within the power of either the prosecution or the defense to produce a witness who could give material testimony on an issue in the case, failure to call that witness may give rise to an inference that his testimony would be unfavorable to that party. However, no such conclusion should be drawn by you with regard to a witness who is equally available to both parties, or where the witness' testimony would be merely cumulative." (Tr. 200)

The reporter's transcript of the trial does not include the summations of counsel, but we can surmise, correctly we think, that the Government argued to the jury that the doctor who examined the defendant at defendant's request would have testified that he was sane.

5. Wade v. United States, 426 F.2d 64 (9th Cir. 1970) (en banc).

6. Not too many years ago this was called Dementia Praecox. Dorland, *The American Illustrated Medical Dictionary*, 1333 (22nd ed. 1952).

Thus, the issue was presented to the jury whether the defendant was, on the date in question, an active schizophrenic of the paranoid type. The doctor admitted that he was furnished with no history of any prior mental illness, and that the defendant had no prior emotional problems but enjoyed good health, and that he had lived and worked in Tucson for a period of 17 years without any problems of any kind other than going broke once, and that for the last 5 years to the date of trial he had been in the electrical business for himself.

Upon being pressed by the prosecutor, the doctor agreed that there were three factors that were the basis for his diagnosis, namely, (1) the defendant's long history of drinking, (2) his failures in marriage and business, and (3) the *possibility* of defendant having had auditory hallucinations. He agreed that the information on defendant's drinking came from the defendant, as also the information concerning his marriages and one business failure. He testified that the defendant told him he had been married five times. Marriage No. 1 lasted four years; marriage No. 2 lasted ten years—six good and four bad; marriage No. 3 lasted two weeks—defendant said that the woman married him because she thought he had money; and marriage No. 4 he said he just couldn't take, but how long it lasted the jury was not told, nor was it told about his present marriage, although the doctor knew that he was married since 1969 but didn't ask the defendant whether it was failing. He agreed with the prosecutor that he could not see any evidence of paranoia with respect to any one of the marriages.[7] But he considered the total picture reflected a paranoid schizophrenic because that type generally has difficulty in establishing and maintaining close interpersonal relationships. The only factors with respect to his difficulties in business were one failure and the

fact that he had worked for a number of people.

With reference to auditory hallucinations, the doctor admitted that the defendant *denied* hearing any voices but in the past there might have been sounds he would hear in the house, and not knowing the reasons for such sounds he would look around and *ascertain* what the cause of the sounds or noises were. From that the doctor said that there was a *possibility* that he was having auditory hallucinations, but he quickly conceded that he, also, would look around the house if he heard a noise that was unfamiliar to him.

The doctor, probably realizing that these three factors were far from sufficient for a sound diagnosis, testified that there were additional factors, namely, that defendant was aloof when being examined and appeared to be withdrawn, that he was unable to develop any rapport with him, and that defendant was vague on details.

The prosecutor then brought out that the defendant knew he was being examined by a doctor appointed at the request of the prosecution because the doctor told him, and that the vagueness in details referred only to the fact that defendant couldn't recall the name of the other psychiatrist who had examined him. The doctor was also confronted with the statement in his written report that the defendant told his story in a straightforward, detailed fashion.

Since the report of the doctor indicated that he had given the defendant a mental status evaluation by asking him to give the meaning of three proverbs, the prosecutor pressed him on the answers that the defendant gave to, "A bird in the hand is worth two in the bush," "All that glitters is not gold," and "The golden hammer beats down the iron door." The doctor agreed that the defendant gave the *meanings of the*

7. We can think of two multimillionaires, J. Paul Getty and Lewis Rosensteil, and two famous actresses, Elizabeth Taylor and Gloria Swanson, each of whom have been married five times.

*first two correctly* but the answers did not represent *abstract* thinking but *concrete* thinking, and that defendant did not know the meaning of the last proverb. The doctor also admitted that he did not know the extent of the defendant's education, but agreed that education would have some relevancy in assaying an answer.

The doctor admitted that, after his first 90-minute examination of the defendant, he asked the prosecutor to seek a continuance of the trial because he had not then obtained sufficient information to give a diagnosis. When the continuance was obtained the doctor never performed any other tests, nor did he ask for time to have an alcohol tolerance level test.

Finally, the doctor said that there was yet another factor that he relied upon, namely, that defendant had amnesia as to the events of the crime. Upon being pressed by the prosecutor to explain why the defendant was rather specific in all of the details of the day before and of his drinking, including the names and addresses of the four different bars that he had visited on the 12th and 13th of April, and could remember all other events, including the various marriages and various business relationships, but drew a blank only with regard to the events of the crime itself, the doctor replied that he believed the history as given to him by the defendant with regard to his drinking but did not believe he had stopped at the various bars he said he did on April 12th and 13th.

On the issue whether defendant at the critical time, *i.e.*, on the day of the crime, moved from sanity to insanity or from latent schizophrenia to paranoid schizophrenia because of his drinking, the following from his cross-examination is most revealing:

"Q. You are at best guessing as to the effects of alcohol and [on] Mr. Shackelford, is that correct? You haven't performed any tests, you don't know how much alcohol he ingested, and you really have no idea what his tolerance for alcohol is, do you?

"A. I have no first-hand data as to his tolerance for alcohol, correct.

"Q. So you are guessing what the effects of that ingestion of alcohol might have been on that date?

"A. I feel it is an educated guess.

"Q. But a guess?

"A. That is correct."

He could not explain why he accepted defendant's statement that he had amnesia as to the events during the commission of the crime and had no amnesia in recalling other events so closely related. He also admitted that the defendant gave two dates for the onset of the amnesia, namely, April 11th, and later on, April 12th. Finally, the doctor had grave difficulty in explaining how a person who did not have substantial ability to understand what he was doing because of mental illness could nevertheless be as suspicious as the defendant was, particularly when it was discovered that he was being watched during the extortion plot, and was nevertheless able to devise a very secretive means by which to conceal the receipt of the money. The best answer that the doctor could give was that the defendant was "a good paranoid."

Defendant also introduced the testimony of a lay witness, an attorney, who had an attorney-client relationship with the defendant about two weeks before April 13, 1972. The attorney said that he could not get through to the defendant during a conference they had had and that in his opinion the defendant on that day was not of sound mind. He drew this impression because he said that during the conference in which he was trying to explain that a promissory note had defenses of limited application, the defendant kept insisting that the *landlord* was in some kind of a conspiracy against him. On cross-examination he admitted that he had never seen the defendant under the influence of liquor,

that he couldn't describe any bizarre actions of the defendant, and that that conference indicated not that the defendant didn't understand what he was trying to explain to him but rather that defendant insisted on going over other points that had no relevancy to the promissory note.

In rebuttal, the Government called two witnesses. A barmaid who had seen the defendant during a week or two before the crime testified that although defendant had a considerable number of drinks on five or six occasions, he always acted normally in conversation and in expression, that he was responsive, that he would smile at appropriate times, that he would be emotional or unemotional, depending on the circumstances, and that he was particularly emotional when he learned that the F.B.I. had arrested his confederate. The other witness was the F.B.I. Agent, who spoke to defendant after his arrest. He testified that after advising defendant of his rights, he told the Agent, even though he then appeared to be under the influence of alcohol, that he had been visiting the bar for the last three days with his confederate and that he was not involved in the extortion plot.

We have analyzed, perhaps to the point of prolixity, defendant's expert's evidence of insanity, in order to demonstrate that it was not supported by objective facts but on the contrary by information furnished by the defendant and to show that the doctor's opinion was severely shaken by the rigorous and thorough cross-examination. Shackelford's only lay witness did not provide any adequate evidence that the defendant was acting erratic and peculiar prior to the extortion. On the other hand, the Government lay witnesses who were in a position to observe the defendant during and immediately subsequent to the crime testified unswervingly to his sanity.

■ The issue before us is whether the Government presented sufficient evidence to take the sanity issue to the jury. "The quantum and nature of the proof the Government must offer to take the case to a jury varies in different situations and to some degree depends upon the quantum and nature of proof the defendant offers." United States v. Westerhausen, 283 F.2d 844, 852 (7th Cir. 1960). On the record before this Court, and with an eye towards the rule that the evidence must be viewed in the light most favorable to the Government, we hold that the motion for acquittal was properly denied because reasonable men would not necessarily retain a reasonable doubt about defendant's sanity at the time of the crime. United States v. Julian, 440 F.2d 779, 780 (9th Cir. 1971).

■ A jury after being properly instructed on the law regarding sanity, "may, of course, reject expert opinion if it finds that the opinion was based on an incorrect view of the facts." United States v. Ingman, *supra,* 426 F.2d at 977. The record in this case amply supports the jury's verdict that the defendant was sane beyond a reasonable doubt. It took the jury only 25 minutes.

■ The appellant's second argument, namely, that the Government failed to prove a necessary element of the crime, is without substantial merit.

■ In order to satisfy the statute, 18 U.S.C. § 1951, the effect on interstate commerce need only be to a minimal degree. United States v. Addonizio, 451 F.2d 49 (3rd Cir.), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (Douglas, J., dissenting on other grounds), rehearing denied, 405 U.S. 1048, 92 S.Ct. 1309, 31 L.Ed.2d 591 (1972).

United States v. Hyde, 448 F.2d 815 (5th Cir. 1971), cert. denied, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972), reaffirmed that "all of the Hobbs Act cases agree that the court should determine whether the facts alleged meet the statutory requirement of affecting interstate commerce." 448 F. 2d at 839. Here the court, by its own

questions of the principal witness for the airline, ascertained that as a result of the defendant's telephone call there was "a 24-hour delay in any of the cargo" and that "passengers were delayed from getting on board the aircraft not only at our station (Tucson) but other stations too." To be sure, there was no testimony that said, in so many words, that X or Y or Z TWA plane leaving Tucson that day had, as its destination, Los Angeles, Chicago, New York, or Paris, but the Government should not be penalized for its failure to belabor the obvious. We were told many years ago, in Commonwealth v. Peckham, 68 Mass. (2 Gray) 514, 515 (1854), "Jurors are not to be presumed ignorant of what everybody else knows, and they are allowed to act upon matters within their general knowledge without any testimony on those matters." We will go one step further and hold that district judges are not to be presumed to be ignorant of what everybody else knows. Mr. Justice Frankfurter, referring to the Justices in his court, in Watts v. Indiana, 338 U.S. 49, 52, 69 S.Ct. 1347, 1349, 93 L.Ed. 1801 (1949), said, "And there comes a point where this Court should not be ignorant as judges of what we know as men."

Judgment affirmed.

ELY, Circuit Judge (dissenting):

I respectfully dissent. My disagreement with my Brothers rests upon my interpretation of United States v. Cooper, 465 F.2d 451 (9th Cir. 1973), United States v. Ingman, 426 F.2d 973 (9th Cir. 1970), and Buatte v. United States, 330 F.2d 342 (9th Cir. 1964). I concede that there are factual distinctions between these three cases and the case at hand. I cannot, however, bring myself to the conclusion that the factual differences are of such significance as to warrant the majority's holding that *Cooper, Ingman,* and *Buatte* are not controlling. I would reverse.