**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Noel Allan INGMAN, Defendant-
Appellant.**

**No. 23507.**

United States Court of Appeals,
Ninth Circuit.

May 13, 1970.

George O. Tamblyn (argued), Portland, Or., for appellant.

Jack Collins (argued), Asst. U. S. Atty., Sidney I. Lezak, U. S. Atty., Charles Turner, Asst. U. S. Atty., Portland, Or., for appellee.

Before BROWNING and DUNIWAY, Circuit Judges, and GRAY, District Judge *.

DUNIWAY, Circuit Judge:

Ingman appeals from his conviction by a jury under two indictments, one charging that he had acquired marihuana without having paid the transfer tax in violation of 26 U.S.C. § 4744(a) (1) and the other that he wilfully failed to appear for arraignment in violation of 18 U.S.C. § 3150. The two charges were tried together. He received a three year sentence on the marihuana charge and a two year sentence on the bail-jumping charge, the latter sentence to be served consecutively to the former. We reverse as to the marihuana charge and affirm as to the bail-jumping charge.

Federal narcotics agents arrested Ingman on August 22, 1967, at the Portland, Oregon airport with a package in his possession containing four pounds of marihuana. Ingman had just picked up the package at the air freight desk, using an assumed name. The four pounds were the remainder of a larger shipment of marihuana sent by Ingman's brother in Los Angeles; narcotics agents in Los Angeles had confiscated most of the shipment after being notified by air freight employees who had become suspicious of the package and opened it.

Ingman admitted the facts charged; his sole defense at trial was insanity. He presented testimony by two psychiatrists and of himself, of an acquaintance, and of his stepsister. The government's evidence came from three lay witnesses and its cross-examination of the psychiatrists. The lay witnesses were an air freight agent, a Bureau of Narcotics agent, and a customs agent, who observed Ingman at one or the other of the times of the offenses. Each said that he had observed and talked with Ingman for some time, that Ingman had a good memory, and that Ingman did nothing that was strange, unusual, bizarre, or irrational. One, who had seen many persons under the influence of narcotics, said that on August 22, 1967, the date of the marihuana offense, Ingman was not "under the influence" of such drugs. Ingman told him that he did not use "acid" (LSD). Another, who was similarly experienced, was of the same opinion as to Ingman's condition on December 18, 1967, when he was arrested for the second offense, which occurred on September 27, 1967. Ingman testified,

---

* Honorable William P. Gray, United States District Judge, Central District of California, sitting by designation.

and the jury could also consider his demeanor and testimony.

Ingman originally challenged his convictions on only two grounds, both stemming from his insanity defense. We need not reach these contentions with respect to the marihuana charge. We do consider them with respect to the bail-jumping charge.

### I. *The marihuana offense.*

■ After the trial in this case, and after oral argument on appeal, the Supreme Court decided Leary v. United States, 1969, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57. Although *Leary* itself involved 26 U.S.C. § 4744(a) (2), a companion case, United States v. Covington, 1969, 395 U.S. 57, 89 S.Ct. 1559, 23 L. Ed.2d 94, found 26 U.S.C. § 4744(a) (1) unconstitutional as well. We vacated submission pending the outcome of Scott v. United States, 9 Cir., 1970, 425 F.2d 55, in which this Circuit considered the retroactivity of *Leary* in banc. *Scott*, how-which this Circuit considered the retroactivity of *Leary* in banc. *Scott*, however, did not decide the retroactivity question here presented. On the retroactivity issue, *Scott* deals only with the "presumption" contained in 21 U.S.C. § 176a. It is true, however, as stated in *Leary* (395 U.S. at 27, 89 S.Ct. 1532), that a "timely and proper assertion of the privilege against self incrimination would have provided a complete defense" to Ingman's prosecution under 26 U.S.C. § 4744(a) (1). Our decision in Meadows v. United States, 1969, 420 F.2d 795, dealing with a comparable question, the retroactivity of Haynes v. United States, 1968, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923, compels the conclusion that, as they affect 26 U.S.C. § 4744 (a), *Leary* and *Covington* are retroactive, and we so hold. However, as in *Leary*, there remain further questions whether this appellant's claim of the privilege was timely and whether it was waived.

As in *Leary*, the privilege was not asserted at trial. But Ingman's trial, un-like Leary's, took place after the Supreme Court's decisions in Marchetti v. United States, 1968, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889; Grosso v. United States, 1968, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906; and Haynes v. United States, 1968, 390 U.S. 85, 88 S.Ct. 722, which can be said to have foreshadowed *Leary*. Moreover, Ingman failed to raise the issue either in a motion for a new trial or, initially, on appeal in this court. He raised it for the first time in a letter, dated June 5, 1969, after oral argument.

■ While it is certainly true that the *Marchetti* trilogy left a crack in the "solid wall" of authority upholding § 4744, cases affirming convictions under that statute abounded in this as in other circuits. Even if Ingman had asserted his privilege at trial, it is unlikely that the district court would have decided to anticipate *Leary*, which the Supreme Court had just agreed to hear, or *Covington*, which the Court had not yet agreed to hear. To do so it would have had to dismiss the marihuana charge altogether. It was not a situation in which a timely motion would have given the trial court a chance to avert error that would necessitate retrial. Nor is there any danger that Ingman was hedging the risk of an adverse verdict by inviting error, since the privilege was a complete defense to his prosecution. The only imaginable explanation for Ingman's failure to raise the defense, either at trial or on appeal, is that he believed it was not available to him, or was ignorant of it. We cannot say that this belief or ignorance, in these circumstances, makes his omission an effective waiver of his constitutional privilege.

In Meadows v. United States, 9 Cir., 420 F.2d 795 (December 23, 1969) we held that Meadows had not waived his rights under the Supreme Court's decision in Haynes v. United States, 1968, 390 U.S. 85, 88 S.Ct. 722, by entering a plea of guilty. *Haynes* too would have provided a complete defense to prosecution. See also Leary v. United States, *supra*, 395 U.S. at 27–30, 89 S.Ct. 1532;

Grosso v. United States, *supra*, 390 U.S. at 70–71, 88 S.Ct. 709; Scott v. United States, 9 Cir., 1970, 425 F.2d 55 [1].

We conclude that Ingman has not waived his right to raise his fifth amendment defense. His conviction under 26 U.S.C. § 4744(a) (1) must be reversed. See Leary v. United States, *supra*, 395 U.S. at 53, 89 S.Ct. 1532.

## II. *The bail-jumping offense.*

With respect to the jury's rejection of his insanity defense, Ingman argues (1) that as a matter of law the government was obligated to produce expert testimony to rebut that of the experts, and (2) that there is insufficient evidence of his sanity to sustain a conviction.[2]

1. The first point is without merit. No rule of law requires the prosecution to adduce expert psychiatric testimony whenever a defendant introduces such evidence. See Mims v. United States, 5 Cir., 1967, 375 F.2d 135. If a defendant raises the defense of insanity and offers evidence in its support, the presumption that every man is sane disappears. The prosecution then has the burden of proving the fact of sanity beyond a reasonable doubt. Davis v. United States, 1897, 165 U.S. 373, 378, 17 S.Ct. 360, 41 L.Ed. 750; Buatte v. United States, 9 Cir., 1964, 330 F.2d 342. But "[t]he nature and quantum of evidence of sanity which the Government must produce to sustain its burden and take the case to the jury will vary in different cases." Brown v. United States, 5 Cir., 1965, 351 F.2d 473, 474.

We have reversed a conviction where the prosecution presented only the evidence of lay witnesses after the defense presented expert psychiatric testimony supporting a finding of insanity. Buatte v. United States, 9 Cir., 1964, 330 F.2d 342 (*Buatte I*). But the murder conviction in *Buatte I* was reversed because the government "failed to produce sufficient evidence to support a finding of sanity by the jury" (330 F.2d at 347), and not because the government failed to bring in experts. In some cases, the government may take a considerable risk by not presenting expert evidence on the issue. For example, on Buatte's second trial for assault to commit murder upon another person, the government produced expert testimony which supported a sanity finding, and this was found to be adequate to sustain the conviction. Buatte v. United States, 9 Cir., 1965, 350 F.2d 389 (*Buatte II*). The expert testimony was the margin of difference between the disparate results in the two *Buatte* cases. Neither *Buatte* case supports Ingman's argument. On the contrary, *Buatte I* expressly recognizes that there are many cases in which lay testimony alone is sufficient to overcome that of experts.

2. In this case, the evidence of Ingman's sanity is sufficient to sustain his conviction. The record indicates that no motion for judgment of acquittal under Rule 29, F.R.Crim.P., was ever made. The failure to make such a motion can waive the sufficiency of evidence question on appeal. See Ortiz-Jiminez v. United States, 9 Cir., 1968, 393 F.2d 720. Nonetheless, this court "may, and frequently does, review the sufficiency of the evidence to prevent a manifest miscarriage of justice." Beckett v. United States, 9 Cir., 1967, 379 F.2d 863, 864. See also Hiatt v. United States, 8 Cir., 1967, 384 F.2d 675 (Rule 52(b) plain error); Maxfield v. United States, 10 Cir., 1966, 360 F.2d 97; Garrett v. Unit-

---

1. Ingman took the stand at trial and testified at length. The Supreme Court was faced with a similar record in *Leary* and found that Leary had not waived his privilege by his testimony. See Leary v. United States, *supra*, 395 U.S. at 28–29, 89 S.Ct. 1532. We reach the same conclusion with respect to Ingman.

2. Ingman does not argue that the jury was improperly instructed on the standard for insanity. This circuit has recently adopted the American Law Institute recommendation. See Wade v. United States, 9 Cir., 1970, 426 F.2d 64. Although the trial in this case preceded *Wade*, Judge Solomon's instructions were based on the ALI test.

ed States, 5 Cir., 1966, 356 F.2d 921. We do so here.

The two psychiatrists said that they believed that Ingman was in a psychotic state both at the time of his arrest with the marihuana, and at the time he failed to appear for his arraignment on September 27, 1967. Dr. Mighell said that Ingman suffered an acute psychotic episode following the taking of LSD. In the doctor's opinion, Ingman lacked substantial capacity to appreciate the wrongfulness of his conduct. Dr. Robuck said that Ingman's psychotic state allowed him to appreciate the wrongfulness of his conduct, but that he could not refrain from carrying out his acts because the ends seemed to justify his actions to him. Dr. Robuck viewed the impact of LSD not as the precipitating cause but as "one of the factors involved" in the psychotic reaction. Drs. Mighell and Robuck stated that most of the lay testimony was not in direct conflict with their observations or fact assumptions. The doctors believed that Ingman's "reality testing" was impaired only in a relatively limited area, which pertained to Ingman's belief that "he had a divine command to supply the hippies [in Portland] with marihuana." The psychiatrists said that in actions outside the area of impairment, Ingman might well appear to be quite normal.

However, neither psychiatrist based his opinion on objective symptoms revealed through observation, examination, tests, or treatment. Rather, each relied on subjective symptoms revealed only through statements made to them by Ingman. They thought Ingman told them the truth. The jury, however, did not have to believe that. As we have noted, Ingman took the stand and testified to the same facts which he had given the psychiatrists and upon which they based their opinions as to his mental state at the time of the offenses. From defendant's demeanor, from inconsistencies in his testimony, and from prior contradictory statements, the jury could reasonably have disbelieved Ingman's account of the symptoms of his illness and

thus have found that he lied to the psychiatrists as well. A jury may, of course, reject expert opinion if it finds that the opinion was based on an incorrect view of the facts. See Mason v. United States, 8 Cir., 1968, 402 F.2d 732, 737; Mims v. United States, *supra*, 375 F.2d at 143; *cf.* Carter v. United States, 1957, 102 U.S.App.D.C. 227, 252 F.2d 608, 617.

The judgment of conviction in District Court Case No. CR 67–229 is reversed; that in District Court Case No. CR 67–261 is affirmed.