**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Joseph John SEGNA,
Defendant-Appellant.**

**No. 76–1418.**

United States Court of Appeals,
Ninth Circuit.

April 6, 1977.

As Amended on Denial of Rehearing and Rehearing En Banc June 7, 1977.

David M. Ochoa, Asst. Federal Public Defender, Phoenix, Ariz., argued for defendant-appellant.

William C. Smitherman, U. S. Atty., Michael B. Scott, Asst. U. S. Atty., Phoenix, Ariz., argued, for plaintiff-appellee.

Before WALLACE and SNEED, Circuit Judges, and Gray,* District Judge.

WALLACE, Circuit Judge:

Segna, a non-Indian, shot and killed an Indian policeman on the Navajo Indian Reservation in Arizona. After a trial where the only contested issue was Segna's legal sanity at the time of the

* Honorable William P. Gray, United States District Judge, Central District of California, sitting by designation.

offense he was convicted of first degree murder. 18 U.S.C. §§ 1111, 1152. Segna argues to us that the evidence was insufficient to prove his sanity beyond a reasonable doubt; that the district court erred in refusing to instruct the jury both on the meaning of "wrongfulness" as that word is used in the test of criminal responsibility and on the defendant's post-acquittal status; that prosecutorial misconduct in trial tactics [1] and closing arguments requires a new trial; and that certain of the district court's evidentiary rulings were erroneous. We find the government's evidence of sanity sufficient to sustain the conviction, but because part of the prosecutor's unobjected-to closing argument constitutes plain error, we reverse and remand for a new trial.

I

■ Segna introduced substantial evidence that he was not legally responsible for the killing because of a mental disease or defect. This evidence consisted of the testimony of three psychiatrists, one psychologist and several lay witnesses and various exhibits including letters written by Segna before the killing. All of these expert witnesses agreed that Segna was suffering from a fixed delusionary system, the central feature of which was Segna's belief that he was a persecuted Indian. Both the lay testimony and the nontestimonial evidence tended to substantiate this diagnosis. These experts also agreed that Segna, because of this mental disease, lacked substantial capacity at the time of the killing to conform his conduct to the requirements of the law or to appreciate the wrongfulness of his conduct. *See Wade v. United States*, 426 F.2d 64 (9th Cir. 1970) (en banc).

This evidence clearly destroyed the presumption of sanity and placed on the government the burden of establishing Segna's legal sanity beyond a reasonable doubt. *United States v. Monroe*, 552 F.2d 860, 863 (9th Cir. Feb. 22, 1977); *United States v. Shackelford*, 494 F.2d 67, 70 (9th Cir.), *cert. denied*, 417 U.S. 934, 94 S.Ct. 2647, 41 L.Ed.2d 237 (1974); *United States v. Ingman*, 426 F.2d 973, 976 (9th Cir. 1970). In an effort to meet its burden, the government called several lay witnesses and one psychiatrist, Dr. Gorman. The lay witnesses testified that on occasion prior to and after the killing, Segna did not refer to himself as an Indian but as an Italian, his true ethnic derivation. Dr. Gorman disagreed with the experts called by Segna and opined that Segna was not legally insane under the *Wade* test at the time of the killing. In Gorman's view, Segna had an anti-social, psychopathic personality which did not constitute a mental disease or defect within the meaning of *Wade*.

During cross-examination of Gorman, the doctor's opinion was attacked in three ways. First, Segna's counsel established that the doctor's diagnosis was based on an incorrect view of the facts of Segna's prior life. Second, the doctor was required to modify substantially his definition of "anti-social, psychopathic personality" when counsel pointed out that the actual facts of Segna's life did not coincide with the symptoms which Dr. Gorman had originally stated were characteristic. Finally, Gorman was required to engage in rather farfetched speculation to account for Segna's pre-killing assertions that he was a Indian.

■ The jury resolved the evidentiary conflict against Segna. On appeal, he asks us to conclude that Gorman's testimony was

---

1. Particularly, Segna assigns as reversible error the government's decision to call the victim's widow who, understandably, lost her composure while testifying. Although obviously charged with emotional impact, the testimony of a widow is allowable on the same basis as any other witness. The government's justification for her testimony was to show that the victim was in good health, employed by the Tuba City Police Department and alive when she last saw him before the killing. Because

no timely objection was interposed to the testimony, reversal could occur only if we find plain error. Fed.R.Crim.P. 52(b). While we wonder about the need for this testimony and, if needed, the callous choice of the person selected to give it, we cannot say it amounts to plain error. Furthermore, due to the failure to object, the district judge was not allowed to weigh the extreme prejudice against the minimal relevancy of this evidence.

completely discredited as a matter of law and that accordingly it cannot sustain a guilty verdict. We decline so to hold.

In *United States v. Ortiz*, 488 F.2d 175 (9th Cir. 1973), we were confronted with a similar question and decided that the evidence of sanity was sufficient to sustain the verdict. There we said:

> The psychiatric testimony, presented by both sides, was in conflict. The jury could properly weigh the opinions of both psychiatrists and resolve that conflict. In reviewing their determination, we must view the evidence and all reasonable inferences in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). This standard of review extends to the issue of sanity and the credibility of the experts. *United States v. Handy*, 454 F.2d 885, 888 (9th Cir.), cert. denied, 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86 (1972). In addition to the experts, the jury also heard lay witnesses who, because they had observed [the defendant] during the execution of the crime, provided meaningful testimony that the jury could consider.  .  .  .  We hold that this evidence was sufficient to sustain the verdict.

*Id.* at 178.

The reasoning of *Ortiz* leads us to the conclusion that the evidence presented in this case could sustain the verdict. The jury may properly resolve conflicts in psychiatric testimony. *Id.* Dr. Gorman testified that Segna was not legally insane and there was some basis for his conclusion. He examined Segna for approximately one and one-half hours. Further, even after he came to a correct knowledge of Segna's prior life during cross-examination, the doctor adhered to his conclusion regarding Segna's sanity. Reviewing this evidence in a light most favorable to the government, as *Ortiz* directs, we find that the jury could have reasonably believed Dr. Gorman and disbelieved the other expert witnesses. Moreover, the testimony of lay witnesses provided some support for a conclusion of

sanity. The jury is entitled to consider this evidence in its deliberations. *See id.* We therefore hold that, when viewed in the light most favorable to the government, the evidence was sufficient to permit reasonable jurors to conclude that Segna was legally sane beyond a reasonable doubt.

## II

■ In his closing argument to the jury, the prosecutor made erroneous and misleading statements of the law. The effect of those statements was to shift the burden of proof from the government to Segna and to deprive Segna of the benefits of the reasonable doubt standard.[2] Although no objection was interposed, the argument amounts to plain error and requires reversal.

While commenting on Segna's insanity defense in his argument, the prosecutor told the jury that in resolving the issue

> there are two things you can rely on. Fortunately, the law is something that you can rely on. There are certain presumptions in the law. One of those presumptions is that a person realizes the consequences of his acts.

He then stated that this presumption continues until overcome by competent evidence. Thereafter he made both direct and oblique attacks on the competency of Segna's evidence of insanity.

Also, in an effort to defend Dr. Gorman's testimony, the prosecutor argued:

> The only difference between his [Dr. Gorman's] opinion and the other shrinks' opinions is that his opinion has a presumption of law with it. That is, a man is presumed sane.

In concluding, the prosecutor asked the jury to return a guilty verdict "unless you are convinced by scientific evidence the man [Segna] is sick and doesn't appreciate the wrongfulness of his acts."

As noted earlier, at the outset of every criminal case there is a presumption that the accused was legally sane at the time he committed the alleged offense. If, how-

---

2.  *See United States v. Ingman*, 426 F.2d 973, 976 (9th Cir. 1970).

ever, "a defendant raises the defense of insanity and offers evidence in its support, the presumption that every man is sane disappears. The prosecution then has the burden of proving the fact of sanity beyond a reasonable doubt." *United States v. Ingman, supra,* 426 F.2d at 976.

After Segna produced his expert and lay witnesses and nontestimonial evidence on the insanity issue, no presumption of sanity existed in the present case.[3] No presumption was available to aid the prosecution in meeting its burden of proof, and no legal presumption could have been considered properly by the jury. *United States v. Bohle,* 445 F.2d 54, 69–71 (7th Cir. 1971).

In light of these principles, it is clear that the prosecutor's argument was erroneous as a matter of law. In essence, he stated that it was still open to the jury to weigh the presumption of sanity against Segna in reaching its verdict. This error was compounded by his final request to the jury that it return a guilty verdict not if it found Segna sane beyond a reasonable doubt, but rather if Segna failed to convince the jury "by scientific evidence" that he was *not* sane.[4]

Finding error, however, is only the first step. Because Segna's counsel failed to object, we may reverse only if the error amounts to "plain error" under Rule 52(b), Fed.R.Crim.P. Appropriately, this is a rigorous standard. We have stated on numerous occasions that we will reverse under Rule 52(b) only in those very exceptional circumstances where reversal is necessary in order to prevent a miscarriage of justice or to preserve the integrity and reputation

of the judicial process. *E. g., United States v. Wysong,* 528 F.2d 345, 348 (9th Cir. 1976); *United States v. Larson,* 507 F.2d 385, 387 (9th Cir. 1974); *United States v. Trejo,* 501 F.2d 138, 141 (9th Cir. 1974); *United States v. Cozzetti,* 441 F.2d 344, 352–53 (9th Cir. 1971). Nevertheless, if unobjected-to error is "seriously prejudicial" to the defendant, *Reisman v. United States,* 409 F.2d 789, 791 (9th Cir. 1969), reversal is warranted.

Plain error is not determined in a vacuum. The prejudicial nature of unobjected-to error must be determined by reference to the whole case. *See Reisman v. United States, supra,* 409 F.2d at 791; 3 C. Wright, Federal Practice & Procedure § 856, at p. 373 (1969). Particularly we should attempt to determine the impact of the error on the jurors' deliberations. If the probability is high that the error materially affected their verdict, reversal may be justified. *Cf. United States v. Valle-Valdez,* 554 F.2d 911 (No. 76–1953, 9th Cir. Mar. 8, 1977).

Here the only contested issue was Segna's legal sanity. The crucial nature of this issue was heightened by the sharply conflicting views of the experts. Although the evidence was sufficient for us to sustain a finding of sanity by the jury, an objective review of the record, that is, one that does not view the evidence only in the light most favorable to the government as the prevailing party, reveals that the issue was extremely close.

In this setting, the jury was told that Dr. Gorman's opinion had "a presumption of law with it" while the opinions of the other experts did not. The effect of this was to

---

**3.** We are not confronted here with the question of the quantum of evidence necessary to dissipate the presumption. See *United States v. Bohle,* 445 F.2d 54, 70 (7th Cir. 1971).

**4.** In both his opening statement and arguments, the prosecutor made comments that indicated he correctly understood the respective burdens of proof concerning the insanity issue. During oral argument before us, the prosecutor stated that he did not *knowingly* attempt to shift the burden of proof; he stated that any error was the result of his inexperience in litigating the insanity issue.

But even assuming his good faith, it is ordinarily the *effect* of the error on the defendant, not the motive for introducing the error, that is determinative of a Rule 52(b) issue. *See Reisman v. United States,* 409 F.2d 789, 791 (9th Cir. 1969).

This does not mean, of course, that an appellate court, in exercising its discretion under Rule 52(b), *United States v. Trejo,* 501 F.2d 138, 141 (9th Cir. 1974); *Billeci v. United States,* 290 F.2d 628 (9th Cir. 1961), may not properly consider whether the prosecutor has intentionally engaged in improper conduct.

envelop Dr. Gorman's opinion in an aura of official approval. Further, Segna's entire defense was aimed at establishing, at a minimum, a reasonable doubt in the jurors' minds regarding his sanity. Such a doubt would properly have required acquittal. Yet the jury was told by the prosecutor as his final comment that it was to acquit only if convinced by scientific evidence that Segna was not sane.

Some facts and circumstances in the case tend to mitigate the prejudicial effect of the prosecutor's argument. The court's instructions to the jury correctly stated the law regarding proof of sanity or insanity. During argument, Segna's counsel likewise correctly stated the law, and even some of the prosecutor's comments on the issue were correct. Nevertheless, in light of all the facts and circumstances of this case, including the extremely close question the jury was to resolve and the timing of the error, we believe it is highly probable that the prosecutor's argument materially affected the verdict and thereby seriously prejudiced Segna. This amounts to plain error under Rule 52(b). Accordingly, we reverse and remand for a new trial.

### III

Segna raises one issue on appeal which we believe should be addressed in an effort to avoid error in the trial on remand.

Segna requested, but was refused, an instruction defining the term *wrongfulness* in the *Wade* test of legal insanity.[5] He proposed to define wrongfulness as meaning moral wrongfulness rather than criminal wrongfulness. In other words, if you find that the defendant, because of a mental disease or defect, lacked substantial capacity to appreciate the moral wrongfulness of his conduct even if he knows his conduct to be criminal but so commits it because of a delusion that he was morally justified then your verdict must be not guilty . . ..

The district judge refused the instruction because he felt that the term *moral* added nothing and would only confuse the jury.

One of the classic debates in criminal law has centered on the meaning of the words *wrong* and *wrongfulness* as they are used in the various definitions of criminal responsibility. In this context, the word *wrong* has three possible definitions. First, the word may mean legally wrong, or "contrary to law." Thus a person is criminally responsible if he has substantial capacity to appreciate that his act violates the law. Second, the word may mean "contrary to public morality." Here a person is criminally responsible, regardless of his appreciation of his act's legal wrongfulness, if he is aware at the time of the offending act that society morally condemns such acts. Third, the word may mean "contrary to one's own conscience." Under this "subjective" approach, the accused is not criminally responsible for his offending act if, because of mental disease or defect, he believes that he is morally justified in his conduct—*even though* he may appreciate either that his act is criminal or that it is contrary to public morality. *See* H. Fingarette, The Meaning of Criminal Insanity 152–157 (1972); A. Goldstein, The Insanity Defense 51–53 (1967).

In *Wade,* we adopted the third definition by choosing the alternate word *wrongfulness*[6] in the American Law Institute's test of legal insanity, rather than the

5. That test reads:

A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

*Wade v. United States,* 426 F.2d 64, 71–72 (9th Cir. 1970) (en banc).

6. It is clear from the ALI debates leading to inclusion of the alternative word *wrongfulness*

in the ALI test that the drafters intended that word to mean more than contrary to law. It is less clear, however, whether the drafters intended this expanded term to be measured objectively or subjectively, that is, whether they favored the second or the third definition of *wrong.* Nevertheless, the weight of the discussions points toward a preference for the third definition. American Law Institute, ALI Proceeding—Thirty-eighth Annual Meeting 314–17 (1961).

Institute's initially accepted word *criminality*, and by then defining *wrongfulness* in subjective terms. In our view, use of the word wrongfulness in the test of legal insanity would "exclude from the criminally responsible category those who, knowing an act to be criminal, committed it because of a delusion that the act was morally justified." 426 F.2d at 71 (footnote deleted).

But one word can carry only a limited conceptual burden. Accordingly, in *United States v. McGraw,* 515 F.2d 758 (9th Cir. 1975), we found it necessary to reverse and remand a case because the district court had refused to give a requested instruction elaborating on the meaning of the word *wrongfulness.* There, both sides had introduced expert testimony that because of mental illness McGraw believed that he was morally justified in committing the act, although the government's expert opined that McGraw did not lack the capacity to appreciate that society considered his conduct to be wrong. Likewise, in *United States v. Sullivan,* 544 F.2d 1052 (9th Cir. 1976), we reversed and remanded because the district court had refused a clarifying instruction on *wrongfulness.* As in *McGraw,* evidence arose during the course of the trial that Sullivan committed the criminal act under a false belief, resulting from a mental disease, that the act was morally justified.

The government argues that a clarifying, amplifying instruction is proper only when an expert witness concludes that the defendant lacks substantial capacity to appreciate the moral wrongfulness of his conduct. Segna suggests that the term *wrongfulness* is always ambiguous and that a clarifying instruction must be given on request. We reject both extremes and adhere to a more traditional rule that the district court must, when properly requested, instruct on the issue if the record contains evidentiary support for the defendant's theory that, although he realized the offending act was illegal, because of mental disease he possessed a false belief that the act was morally justified. *United States v. Sullivan, supra,* 544 F.2d at 1056; *see United*

*States v. Noah,* 475 F.2d 688, 697 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 119, 38 L.Ed.2d 54; 414 U.S. 1095, 94 S.Ct. 728, 38 L.Ed.2d 553 (1973); *Charron v. United States,* 412 F.2d 657, 660 (9th Cir. 1969); *Perkins v. United States,* 315 F.2d 120, 124 (9th Cir.), *cert. denied,* 375 U.S. 916, 84 S.Ct. 201, 11 L.Ed.2d 155 (1963).

We do not pass upon Segna's proposed instruction on this subject nor do we consider whether there was sufficient evidence to require its being given. These questions can be resolved at the new trial. We find it unnecessary to discuss the remaining issues which Segna has raised.

REVERSED AND REMANDED.

WILLIAM P. GRAY, District Judge, concurring and dissenting:

I agree that the conviction must be reversed for the reason asserted in the opinion of the court. However, in light of all of the evidence presented at the trial, I do not see how any reasonable jury could possibly have found beyond reasonable doubt that Segna was sane. It is true that Dr. Gorman testified to a contrary conclusion, but most of the factual assumptions upon which his opinion rested were thoroughly destroyed, and his "rather far-fetched speculation" to which the majority opinion refers bordered on the incredible. I think that a directed verdict on the insanity issue was indicated.

Also, it seems to me that one aspect of the prosecutor's conduct deserves more attention than has thus far been accorded it in the opinion (see footnote No. 1). There was never any issue as to the fact that Segna shot and killed the decedent police officer shortly after the latter and a fellow officer drove in their patrol car to the scene of a disturbance that Segna had created.

Nonetheless, the prosecutor called as his first witness the widow of the decedent and began his interrogation by asking her if she was married (!). She responded that she was a widow and, in reply to further questioning, testified that she had been made a widow and her young children fatherless by

234

the events of the day concerned, and that her husband had been in good health when he left for work that morning. In the course of such testimony, this unfortunate lady began to cry, thus fulfilling the obvious reason for her having been called to the stand. It seems to me that such an intentional injection of sympathy and prejudice falls far below the standard of conduct that should be expected of a responsible representative of the United States Attorney.